

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

LEONARDO BLAIR,

       Plaintiff,

  -versus-

THE CITY OF NEW YORK; RAYMOND
KELLY, Commissioner of the New York City
Police Department; and NEW YORK CITY
POLICE OFFICERS WILLIAM CASTILLO and
ERIC REYNOLDS,

       Defendants.

-----------------------------------------------------------x

## PRELIMINARY STATEMENT

1.  This is a civil rights action to vindicate the rights of law-abiding New York City

residents to be free from unconstitutional and unlawful stops, searches and arrests

by members of the New York City Police Department. While walking from his

car to his Bronx home in November 2007, Plaintiff Leonardo Blair, a black New

York City resident who works as a crime reporter for the *New York Post*, was

stopped and frisked by New York City police officers. After aggressively

stopping him and though he had committed no crime, the officers handcuffed Mr.

Blair and took him to the 49th Precinct, where they placed him in a cell. In the

cell Mr. Blair listened as the arresting officers reacted incredulously that, though

he was black, he was not from "the projects." Shortly after learning that he was a

*Post* reporter and had a Master's degree from Columbia University, the officers

released Mr. Blair, though not before issuing him two summonses. A Bronx

Criminal Court judge dismissed both summonses.

1

2.    In the last two years alone, NYPD officers stopped and questioned New Yorkers nearly one million times, part of a dramatic increase in the Department's use of stop-and-frisk tactics since 2002.  Of the nearly one million people stopped in 2006 and 2007, nearly 90% were engaged in entirely lawful activity, as they were neither arrested nor issued a summons.  Members of minority communities are bearing the brunt of these NYPD practices, with blacks and Latinos being the target of nearly 90% of NYPD stops.

3.    The NYPD is using its sweeping stop-and-frisk operation to build a massive database of law-abiding, minority New York City residents.  After conducting stops and frisks, police officers complete forms that, among other things, include the name and address of the person stopped, and that information is then entered into a centralized NYPD database.  As a result of this practice and the surge of stops and frisks over the last several years, the NYPD now has a database of hundreds of thousands if not more than one million law-abiding New Yorkers who, like Mr. Blair, now are at risk of becoming the subject of criminal investigations by virtue of being in the database.

4.    As a consequence of his arrest, Mr. Blair has a permanent scar on his clean record.  An unwarranted arrest is particularly troublesome for Mr. Blair because he is an immigrant; any arrest, even an unfounded one, must be reported on immigration and visa applications and may raise concerns with the immigration authorities.

5.    As a result of their actions, the defendants have violated Mr. Blair's rights under the United States Constitution and under the Constitution and laws of the State of

2

New York. The plaintiff seeks a declaration that the defendants' actions have been unlawful, injunctive relief, damages, and attorneys' fees.

## PARTIES

6.   Plaintiff LEONARDO BLAIR is a twenty-eight-year-old resident of New York City.

7.   Defendant THE CITY OF NEW YORK is a municipal corporation within the State of New York.

8.   Defendant RAYMOND KELLY is the Commissioner of the New York City Police Department, which is an agency of the City of New York. He is sued in his official capacity.

9.   Defendant OFFICER WILLIAM CASTILLO is a police officer employed by the NYPD who arrested Mr. Blair. He is sued in his official and personal capacities.

10.  Defendant OFFICER ERIC REYNOLDS is a police officer employed by the NYPD who arrested Mr. Blair. He is sued in his official and personal capacities.

## FACTS

**Leonardo Blair**

11.  Leonardo Blair is a black man who was born in Jamaica and immigrated to the United States in 2006. After receiving a full-tuition scholarship, he graduated from the Columbia University Graduate School of Journalism in May 2007. He has since worked as a journalist for the *New York Post*, where he works at the City Desk. He reports on a variety of issues in New York City, including crime.

As such, he talks with police officers on a regular basis and has strong and respectful professional relationships with them.

12. Mr. Blair is married and lives with his wife in Manhattan. She is also from Jamaica and works for the United Nations.

13. Mr. Blair remains close with members of his extended family who live in the Bronx. At the time of the incident, Mr. Blair lived in the Bronx with his aunt and uncle.

14. After arriving in New York City in 2006, Mr. Blair had an excellent relationship with NYPD officers.

15. Before November 28, 2007, Mr. Blair had never been arrested.

16. Mr. Blair is currently in the United States on an Optional Practical Training visa, which permits a year of employment after completing an academic program. He is currently preparing to change his immigration status — a process fraught with uncertainty where any blemish in his record can be of importance.

17. Due to his arrest on November 28, 2007, Mr. Blair was forced to complete additional paperwork and obtain legal advice on how to treat the arrest. Unsurprisingly, this has become a source of stress and anxiety for Mr. Blair.

**Suspicionless Stop and Frisk of Leonardo Blair**

18. Shortly after 8:00 PM on November 28, 2007, Mr. Blair was returning home from visiting his then-fiancée and current wife and parked his car on Arnow Avenue near the corner of Arnow and Pearsall Avenues in the Bronx. He grabbed his gym bag, got out of his car and began walking towards his family's home. After

checking that he had locked his car door, he proceeded down Arnow Avenue toward Tenbroeck Avenue.

19.    As soon as he turned onto Tenbroeck Avenue he heard a car screech to a stop. Tenbroeck Avenue was dark and quiet and, walking alone, the sound frightened Mr. Blair.

20.    Given his working relationship with the NYPD, Mr. Blair was relieved to see that the car was an NYPD patrol car. He continued walking and the patrol car followed.

21.    An NYPD officer rolled down his window and threateningly asked Mr. Blair what he was doing coming from the car. The aggressive tone of the question perplexed Mr. Blair.

22.    Without any reasonable grounds to think that Mr. Blair had committed or was about to commit a crime, an officer, who Mr. Blair later learned to be Officer William Castillo, jumped out of the car and positioned himself so physically close to Mr. Blair's face that Mr. Blair had to take a step back.

23.    Officer Castillo physically blocked Mr. Blair from proceeding along the sidewalk towards his home. Mr. Blair was caught off-guard by Officer Castillo's aggressive approach.

24.    Officer Castillo angrily demanded of Mr. Blair whether he spoke English. Mr. Blair, surprised by Officer Castillo's mocking tone, replied under his breath in Spanish that he did not.

25.     Officer Castillo continued to question what Mr. Blair was doing coming from his

        car.  Mr. Blair answered, this time in English, that the car he was coming from

        was his own.

26.     Officer Castillo ordered Mr. Blair to put his hands in the air, and Mr. Blair

        cooperated.

27.     By this time, Officer Castillo's partner, who Mr. Blair later learned was Officer

        Eric Reynolds, had exited the patrol car.

28.     Mr. Blair was not engaging in any illegal or improper activity, and nothing in his

        behavior or conduct would provide the basis for reasonable suspicion that he was

        engaging in any wrongdoing.

29.     Officer Castillo then frisked Mr. Blair.

30.     Officer Reynolds searched through Mr. Blair's gym bag.

31.     The officers found nothing illegal.

**Arrest, Imprisonment and Prosecution of Mr. Blair without Probable Cause**

32.     When the frisk and search were completed, Mr. Blair put his hands down.  Officer

        Castillo yelled that he did not say that Mr. Blair could put his hands down.

33.     Though Mr. Blair had not done anything unlawful, Officer Castillo put Mr.

        Blair's hands behind his back and placed him in handcuffs.

34.     Mr. Blair asked Officer Castillo what he had done wrong.  Officer Castillo replied

        that he had disobeyed a lawful order.

35.  Mr. Blair explained that his family lived nearby and asked to call them. Instead, Officers Castillo and Reynolds pulled Mr. Blair to the police car and pushed him into the backseat.

36.  Both officers refused to explain to Mr. Blair why they had arrested him.

37.  When they arrived at the 49th precinct, Mr. Blair again asked why he was being arrested. Officer Castillo said that he was not being arrested but was receiving a summons.

38.  Believing he was being mistreated, Mr. Blair asked the officers what had happened to "courtesy, professionalism and respect." He was told to "shut up." One of the officers told him that he should be quiet if he knew what was good for him.

39.  The officers placed Mr. Blair in a cell in the holding area.

40.  While Mr. Blair remained in the cell, Officer Castillo and Officer Reynolds emptied Mr. Blair's bag and pulled out his driver's license.

41.  Reading the address from Mr. Blair's identification, Officer Castillo showed it to Officer Reynolds and incredulously remarked words to the effect, "Look at this, he's not even from the projects."

42.  Mr. Blair replied that Officer Castillo should not assume him to be from the projects simply because he was black. He also said that this comment revealed racial profiling and that the officers knew as much.

43.  Mr. Blair asked again why he was being incarcerated. Officer Reynolds replied that he was not incarcerated and asked Mr. Blair if he knew what the word incarceration meant.

44.  Because of the degrading nature of the question, Mr. Blair responded that he had a master's degree from Columbia University and was a reporter for the *New York Post*.

45.  Officer Castillo froze, and his face flushed.

46.  Both officers left the holding area and returned a few minutes later.

47.  Mr. Blair was then told that he was free to go.  He asked again what he had done wrong, and the officers told him that he would see it on his summonses.

48.  Officer Castillo issued two summonses, one alleging that Mr. Blair disobeyed a lawful order and another alleging that Mr. Blair had made "unreasonable noise."

49.  Officer Castillo issued the summonses even though he had no basis for believing that Mr. Blair had done anything unlawful.  These summonses were issued maliciously and without probable cause.

50.  Mr. Blair got the officers' names, took his belongings and left the precinct at approximately 9:10 PM.

51.  Mr. Blair's summonses required him to appear in Bronx Criminal Court on February 8, 2008.  Mr. Blair appeared in court that day, causing him to miss a day of work.

52.  When Mr. Blair appeared at Bronx Criminal Court un February 8, 2008, the summonses had not been withdrawn, which forced Mr. Blair to appear before a Criminal Court judge.  He was represented by an NYCLU attorney, who requested that the summonses be dismissed because they were legally insufficient on their face.  The judge reviewed both summonses and dismissed them.

53.   Mr. Blair filed a Notice of Claim with the Comptroller's office of the City of New York on February 21, 2008.

54.   Because of his arrest and detention, Mr. Blair could hardly sleep for a number of days, and to date, his heart races when he encounters police officers when he is not working.  Furthermore, Mr. Blair now experiences anxiety and apprehension whenever he interviews local residents for his job.

55.   Even though the summonses were dismissed, the mere fact that Mr. Blair was arrested  poses problems for him given his current immigration status.  To apply for a new visa, Mr. Blair must acknowledge to the United States Citizenship and Immigration Services that he was arrested.

56.   Based on both officers' comments and actions during the arrest and at the precinct, Mr. Blair believes he was singled out for a stop, frisk and arrest because of his race.

57.   At all times, Defendants' actions were taken under color of law.


**Mr. Blair's Personal Information Remains in the NYPD's Stop-and-Frisk Database**

58.   According to the NYPD Patrol Guide, every time an NYPD officer stops and frisks someone on the street, he or she must complete a "Stop, Question and Frisk" worksheet, also known as a UF-250, recording information about the encounter, including the name and home address of the person stopped. Furthermore, the NYPD Patrol Guide stipulates that a UF-250 must be completed whenever an officer believes that he has reasonable suspicion to stop an individual, even if the stop results in an arrest or summons.

59.    In March 2006 the NYPD issued an Operations Order requiring that the information from all UF-250s be compiled in a computerized database ("Stop-and-Frisk Database").

60.    Upon information and belief, Mr. Blair's personal identifying information was entered into and remains in the Stop-and-Frisk Database.

61.    On February 5, 2007, the New York Civil Liberties Union (NYCLU) wrote to NYPD Commissioner Raymond Kelly to notify him of the privacy concerns implicated by the NYPD's collection and maintenance of a centralized database of hundreds of thousands of law-abiding New Yorkers and to request that the NYPD remove from its database identifying information about law-abiding persons who were stopped. The NYCLU also noted that New York Criminal Procedure Law requires that the Department seal the database records of any person who had been arrested and whose case ended favorably for the person. Accordingly, the letter asked that the NYPD take steps to assure that the stop-and-frisk records of these individuals be sealed in accordance with the sealing statute. As of the filing of this lawsuit, the NYCLU has received no response to its letter.

62.    On July 25, 2007, the NYCLU requested that the NYPD produce its Stop-and-Frisk Database pursuant to the New York State Freedom of Information Law (FOIL). The NYPD denied that request, including amongst its reasons an assertion that the database was subject to the sealing provision of the Criminal Procedure Law. After the NYCLU filed suit in November 2007 challenging this denial, the Assistant Corporation Counsel representing the NYPD initially asserted to the NYCLU that one defense available to the NYPD was a claim that

the database was subject to the sealing statute. The NYCLU responded that the attorney should check with the NYPD to see if it fact was sealing the database. Several weeks later, the City filed a motion to dismiss the NYCLU's lawsuit (which is pending). Conspicuously absent from that motion was any claim that the Stop-and-Frisk Database could not be disclosed because the NYPD was sealing it under the Criminal Procedure Law.

63.    In 2006 and 2007 the NYPD arrested nearly 50,000 people in conjunction with stops and frisks. Upon information and belief, a substantial number of those arrests, like the arrest of Mr. Blair, resulted in favorable dispositions for the defendants such that the sealing provisions of the Criminal Procedure Law would apply to all records associated with those arrests, including those in the Stop-and-Frisk Database.

64.    Upon information and belief, New York City and the NYPD have a policy, practice, or custom of failing to seal records in the Stop-and-Frisk Database of people who are arrested in conjunction with a stop and frisk and whose cases subsequently are dismissed or otherwise end favorably.

65.    Upon information and belief, the NYPD, pursuant to the policy, practice, or custom alleged above, has not sealed information contained in its Stop-and-Frisk Database concerning Mr. Blair.

**NYPD Pattern and Practice of Unconstitutional Stops and Frisks**

66.    Between 2004 and 2007, the NYPD reported stopping and questioning approximately 1,700,000 people. Though police officers are legally allowed to

stop and question a person only if they have reasonable grounds for suspecting the person has engaged in or is engaging in unlawful activity, those 1,700,000 stops resulted in only approximately 195,000 arrests or summonses, leaving nearly 1,500,000 people who were stopped but who were engaged in entirely lawful activity. That nearly 90% of people stopped and questioned by police officers were law-abiding (and that there 1,500,000 of them) points to a widespread pattern and practice of unlawful stops.

67.    Perhaps explaining the large number of stops of law-abiding New Yorkers, NYPD reports indicate that its officers are stopping persons for reasons that are impermissible. For instance, the single most common factor identified with stops in 2006 and 2007 was that the person was in a high crime area, with that factor being recorded in about 53% of the nearly 1,000,000 stops during those two years. Being in a high crime area -- which describes many New York City neighborhoods -- is not a lawful basis for a stop, and every stop that was based only on this factor or that was based on that and other impermissible factors would be unlawful.

68.    The NYPD's refusal to disclose the Stop-and-Frisk Database has made it impossible at this point to further determine the extent of the Department's use of improper reasons for stopping and frisking persons.

69.    The NYPD has been on notice for many years that its officers may be stopping large numbers of people without legal justification. In the aftermath of the February 1999 shooting of Amadou Diallo, the New York State Attorney General issued a detailed report examining NYPD stop-and-frisk practices. Among other

12

things, that report concluded, based on an examination of the forms competed by officers when making stops, that no lawful basis for the stop had been provided by officers in nearly 40% of stops.

70. In 2001 the Civilian Complaint Review Board (CCRB), an independent New York City agency responsible for investigating reports of police misconduct, issued a report about complaints it had received about NYPD stops and frisks between January 1, 1997 and March 31, 1999. The agency reported that, compared to with all other types of complaints about police-civilian encounters closed during this period of study, it was more likely to conclude that police officers had engaged in misconduct during stops and frisks.

71. According to the CCRB's 2001 report, NYPD officers "testified to using physical force to effect stops for 48% of the whites who filed complaints but 74% of the African-Americans and 76% of the Latinos." The report found that these differences in the use of force were statistically significant and thus were not due to chance. In addition, NYPD officers used guns to stop a greater percentage of blacks and Hispanics than whites. The report also found that these differences were statistically significant and not due to chance.

72. Since 2001 the number of complaints filed each year with the CCRB concerning stop and frisks more than tripled, going from about 1500 in 2002 to over 5000 in 2006. At the same time the proportion of complaints filed with the CCRB concerning stop and frisks has substantially increased.

73. According to NYPD reports, of the stops made between 2004 and 2007, 51.5% were of blacks, while whites comprised only 10.4% of those stopped. By

contrast, the most recent Census figures report that blacks make up only about 25% of the city population and whites 45%. These disparities cannot be explained by the race of suspects about whom the police receive reports, as such reports account for only a small percentage of all stops and frisks. Rather, the vast majority of stops and frisks are initiated by officers based on their own observations.

74.    Despite being on notice for many years about unlawful stop-and-frisk practices and despite there being a particularly vigorous public controversy about those practices over the last year following the release of reports showing a huge increase in stop-and-frisk activity, the NYPD, upon information and belief, has taken no meaningful actions to monitor, supervise, or train its officers so as to reduce or eliminate the unlawful stops and frisks being conducted by members of the Department.

75.    Upon information and belief, the NYPD and New York City have a policy, pattern and practice, or custom of stopping, frisking and questioning individuals without legal justification.

76.    Upon information and belief, Mr. Blair was stopped, frisked, and arrested as a result of the NYPD and New York City's policy, pattern and practice, or custom of stopping individuals without legal justification.

## **JURY DEMAND**

77.    Plaintiff demands a trial by jury in this action on each and every one of his claims.

## FIRST CAUSE OF ACTION

78.   The Defendants' actions violated Plaintiff's rights under the Fourth and

Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION

79.   The Defendants' actions violated Plaintiff's rights under sections 6 and 12 of

Article I of the New York State Constitution.

## THIRD CAUSE OF ACTION

80.   The Defendants' actions violated Plaintiff's rights under the common law of the

State of New York to be free from false arrest; false imprisonment; malicious

prosecution; and assault and battery.

## FOURTH CAUSE OF ACTION

81.   The Defendants have violated Plaintiff's rights under Article 78 of New York's

Civil Practice Law and section 160.50 of the New York Criminal Procedure Law.

## JURISDICTION AND VENUE

82.   This Court has subject-matter jurisdiction over Plaintiff's claims pursuant to 28

U.S.C. §§ 1331 and 1343(3)–(4).

83.   This Court has supplemental jurisdiction over all state constitutional and state law

claims pursuant to 28 U.S.C. § 1367(a).

84.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that Plaintiff's claims arise

in the Southern District of New York.

WHEREFORE, Plaintiff requests that this Court:

    (1) Assume jurisdiction over this matter;

    (2) Issue a declaratory judgment that the Defendants' actions violated the Fourth, and Fourteenth Amendments to the United States Constitution and violated the Constitution and laws of the State of New York;

    (3) Issue an injunction requiring the Defendants to seal or expunge from their records, including but not limited to the NYPD's stop and frisk database, any information concerning Mr. Blair relating to his November 2007 arrest;

    (4) Award compensatory damages;

    (5) Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and

    (6) Grant any other relief the Court deems appropriate.

Respectfully Submitted,

NEW YORK CIVIL LIBERTIES UNION FOUNDATION

CHRISTOPHER DUNN (CD-3991)
ARTHUR EISENBERG (AE-2012)
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300
Counsel for the Plaintiff

Dated: May 7, 2008
      New York, N.Y.

On the Complaint:

ERIN BRAATZ*
JONATHAN HERCZEG*
JESSICA THOMAS*
Law Students
New York University School of Law
Civil Rights Clinic

*The Plaintiff and the New York Civil Liberties Union Foundation will be seeking leave of court to permit these students to serve as attorneys in this matter pursuant to the Southern District's Plan for Student Practice in Civil Actions.